Filed 2/8/18; Certified for Publication 3/8/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CHRISTINE DEAN et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>FRIENDS OF PINE MEADOW et al.,<br><br>      Defendants and Respondents. | A149735<br><br>(Contra Costa County<br>Super. Ct. No. MSC16-00601) |

## I. INTRODUCTION

Appellants Christine Dean (Dean), DeNova Homes, Inc. (DeNova), and Civic Martinez, LLC (collectively, plaintiffs) filed the underlying action for interference with prospective economic advantage and defamation against respondents Friends of Pine Meadow and several individuals (collectively, defendants),[1] seeking damages and injunctive relief for allegedly false statements and publications regarding plaintiffs' plan to construct a housing development on the Pine Meadow Golf Course in Martinez. Judgment was entered against plaintiffs after the trial court granted defendants' special motion to strike plaintiffs' complaint pursuant to section 425.16 of the Code of Civil Procedure (section 425.16 or the anti-SLAPP law).[2]

---

[1] Defendant Kelly Calhoun was dismissed from this case and is not party on appeal.

[2] Subsequent statutory citations are to the Code of Civil Procedure, unless otherwise stated.

On appeal, plaintiffs contend their claims arise out of commercial speech, which is not protected activity under the anti-SLAPP law. Our standard of review is de novo. (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 681–682.) We affirm.

## II. STATUTORY OVERVIEW

"The Legislature enacted section 425.16 in 1992, noting 'a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' [Citation.] The statute authorizes defendants to file a special motion to strike in order to expedite the early dismissal of unmeritorious claims. [Citation.] '[T]o encourage continued participation in matters of public significance,' and to ensure 'that this participation should not be chilled through abuse of the judicial process,' the Legislature has specified that the anti-SLAPP statute 'shall be construed broadly.' [Citation.]" (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 416 (*Montebello*).)

Section 425.16, subdivision (b) establishes a two-step process for resolving a special motion to strike.[3] "First, the defendant must make a prima facie showing that the plaintiff's 'cause of action . . . aris[es] from' an act by the defendant 'in furtherance of the [defendant's] right of petition or free speech . . . in connection with a public issue.' (§ 425.16, subd. (b)(1).) If a defendant meets this threshold showing, the cause of action shall be stricken unless the plaintiff can establish 'a probability that the plaintiff will prevail on the claim.' (*Ibid.*)" (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21, fn. omitted (*Simpson*).)

"In 2003, concerned about the 'disturbing abuse' of the anti-SLAPP statute, the Legislature enacted section 425.17 to exempt certain actions from it. (§ 425.17, subd. (a).)" (*Simpson*, *supra*, 49 Cal.4th at pp. 21–22.) Pertinent here, section 425.17,

---

[3] Section 425.16, subdivision (b)(1) states: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

subdivision (c) creates an exemption for commercial speech, which provides: "Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services, . . . arising from any statement or conduct by that person if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services. [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer, or the statement or conduct arose out of or within the context of a regulatory approval process, proceeding, or investigation, except where the statement or conduct was made by a telephone corporation in the course of a proceeding before the California Public Utilities Commission and is the subject of a lawsuit brought by a competitor, notwithstanding that the conduct or statement concerns an important public issue."

The commercial speech exemption set forth in section 425.17, subdivision (c) " 'is a statutory exception to section 425.16' and 'should be narrowly construed.' [Citations.]" (*Simpson*, *supra*, 49 Cal.4th at p. 22.) "The burden of proof as to the applicability of the commercial speech exemption . . . falls on the party seeking the benefit of it—i.e., the plaintiff." (*Id*. at p. 26.)

### III.  FACTUAL BACKGROUND

#### A.  The Complaint Allegations

Facts alleged in the plaintiffs' April 2016 complaint include the following: Pine Meadow Golf Course (the golf course) is owned by individual members of the Dean and Coward families, including plaintiff Dean. In August 2011, the golf course owners executed a contract to sell the golf course to plaintiff DeNova, a "leading community-oriented, family-owned private homebuilder with deep-seeded roots in local philanthropy and community service." The sales contract required the parties to work together to file

3

an application for development with the City of Martinez (the City). In January 2015, the City approved a development application, which "allowed for the development and construction of a 99-unit single-family home subdivision, with additional community benefits, including parklands, walking trails, and other neighborhood improvements."

Plaintiffs alleged that the individuals named as defendants in their complaint consistently "opposed any development on the Pine Meadow Golf Course property." During the development application process, they "spoke as individuals at the more than 20 neighborhood meetings, Design Review meetings, Planning Commission meetings, and City Council hearings, always opposing development of the Pine Meadow Golf Course." At some point during that period, they formed defendant Friends of Pine Meadow (Friends). "Immediately" after the development application was approved, defendants began circulating a petition opposing the planned development. "Using the name 'Friends of Pine Meadow' for the first time," defendants sought to collect sufficient signatures to support a referendum to reverse the City's resolution approving a general plan amendment to allow for the planned development.

Defendants allegedly used the name Friends of Pine Meadow in order to deceive fellow citizens into believing they were friends with the golf course owners, including Dean who is a prominent citizen, and that they represented the interests of these owners and the golf course. Defendants' deceptive tactics included using the name Friends of Pine Meadow to: (1) create multiple websites and media sites, including a Facebook group page; (2) make "public comments," and write "letters to the editor and other similar published editorial pieces"; (3) solicit and accept financial donations; and (4) solicit signatures for their referendum "in front of local Martinez storefronts and parking lots." Dean and the other golf course owners attempted to inform people "about the true nature of the Friends of Pine Meadow," but defendants responded by publishing allegedly false accusations that some or all of the plaintiffs were " 'hassling' the signature gatherers" and using " 'intimidation, threats, and obscene, derogatory name calling.' "

Plaintiffs further alleged that defendants made other misrepresentations to the public, including: (1) telling residents that if they signed the referendum petition, the golf

4

course "would be turned into a park"; (2) publishing a false statement that keeping the golf course undeveloped " 'honors the Coward family . . .' "; (3) misrepresenting to people that keeping the site undeveloped " 'continues the historic purpose of the property as open space/recreation use' "; (4) publishing false statements that the golf course is " 'open space' and 'no development can occur' "; (5) publishing false statements that DeNova purchased the golf course knowing it was open space and that houses could not be built on the property. Furthermore, defendants posted a statement on their website that the golf course owners had "worked diligently to try to find a community supported outcome for this property" in order to falsely imply that the golf course owners had a competing interest with DeNova and did not support the development application.

Defendants' allegedly defamatory statements about plaintiffs and their project included: (1) that plaintiffs are guilty of " 'corruption' "; (2) that plaintiffs' efforts to inform the public that defendants are not friends of the golf course were " 'illegal,' " and included " 'hassling' signature gatherers," " 'intimidation, threats, and obscene, derogatory name calling,' " and " 'thuggery' "; (3) that the development plan is for a "288-unit development," which has never been proposed; (4) that the "development of 288 homes is 'just the start of their plan' "; (5) that the golf course owners " 'agreed with' " the idea of designating the golf course as open space; (6) that defendants have collected more than 4,000 signatures opposing the development, when in truth more than 900 signatures were deemed invalid and more than 150 signatures were withdrawn.

These pleading allegations were incorporated into five (purported) causes of action, for (1) declaratory and injunctive relief, (2) intentional interference with plaintiffs' businesses and development plans, (3) negligent interference with plaintiffs' businesses and the development plans, (4) defamation, and (5) conspiracy. For these alleged wrongs, plaintiffs prayed for the following relief: (1) a judicial declaration that defendants' use of the name Friends of Pine Meadow is "misleading, interferes with Plaintiffs' prospective economic advantage, deceives the public into taking acts against the financial interests of Plaintiffs, and damages Plaintiffs' business"; (2) a permanent injunction preventing defendants from using the name Friends of Pine Meadow, requiring

5

them to delete their Facebook group and websites, requiring them to destroy their electronic mailings and mailing lists, and ordering them to "cease and desist with the dissemination of any unverified statements or writings"; (3) general and special damages according to proof; (4) punitive damages in an unspecified amount; and (5) attorney fees and litigation expenses.

### B. The Special Motion to Strike

In May 2016, defendants filed a special motion to strike the entire complaint, arguing that every cause of action arose from speech and petitioning activities protected by section 425.16, and that plaintiffs could not establish a probability of prevailing on the merits because their claims were barred by the First Amendment, the California Constitution, and the litigation privilege codified in Civil Code section 47. Defendants also argued that the challenged statements were not provably false or made with actual malice.

Plaintiffs opposed the motion on the ground that defendants were not entitled to the protections of the anti-SLAPP law because the claims against them arose out of (1) a campaign to spread misinformation about plaintiffs, which was not a "public issue"; and (2) commercial speech designed to give defendants a commercial advantage by devaluing the golf course property so that somebody else would purchase it. Plaintiffs also argued that their claims were not barred by the First Amendment or the litigation privilege because defendants' unlawful conduct fell within the "sham exception" to those doctrines.

On August 29, 2016, the trial court granted defendants' special motion to strike in a detailed ruling supported by extensive citations to pertinent authority. Finding that every cause of action arose from protected petitioning and speech activity, the court rejected plaintiffs' narrow conception of what constitutes a public issue. The court also found that plaintiffs failed to carry their burden of establishing that the commercial speech exemption applied in this case. On the merits, the court concluded that plaintiffs failed to establish sufficient facts to support a favorable judgment if their evidence was credited. In making this determination, the court found that plaintiffs failed to produce

evidence that their claims for business interference fell within the sham exception to the "First Amendment right to petition the government under the *Noerr-Pennington* doctrine." The court also found that plaintiffs' defamation claim failed because they did not demonstrate a likelihood that they could (1) establish a prima facie case for relief; and (2) prove that the absolute privilege set forth in Civil Code section 47 did not apply.[4]

Judgment was entered against plaintiffs on September 28, 2016. This timely appeal followed.

## IV. DISCUSSION

### A. All Causes of Action Arise out of Protected Activity

The first step of our review requires us to decide whether defendants made a threshold showing that the substantive causes of action in the complaint arose from protected activity. (§ 425.16, subd. (b)(1).) " ' "A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)" [citation].' " (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 645; see also *Montebello*, *supra*, 1 Cal.5th at p. 422.)

Under section 425.16, subdivision (e), an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public

---

[4] As the trial court also explained, the causes of action for conspiracy and declaratory and injunctive relief were not independent claims, but were dependent on plaintiffs' showing a probability of prevailing on their claims for the underlying torts of interference with prospective economic advantage and defamation. (See *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1062 ["a civil conspiracy does not give rise to a cause of action unless an independent civil wrong has been committed."]; *MaJor v. Miraverde Homeowners Assn.* (1992) 7 Cal.App.4th 618, 623 ["a cause of action must exist before injunctive relief may be granted"].)

7

interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

As reflected in our summary of the complaint allegations, plaintiffs' interference and defamation claims seek to punish and suppress speech and petitioning activity related to defendants' opposition to the construction of a housing development on a golf course. Most, if not all, the material allegations pertain to statements that were made during or in connection with proceedings to amend the City's general plan, thus falling within section 425.16, subdivision (e)(1) and/or (e)(2). Furthermore, since all the challenged conduct was speech or petitioning activity relating to an issue of public interest, it is protected activity under section 425.16, subdivision (e)(3) and/or (e)(4).

Plaintiffs' primary contention below was that defendants' statements did not pertain to a public issue or an issue of public interest. This argument was properly rejected. As the trial court observed, the plaintiffs' complaint is a paradigm of the problem that section 425.16 was designed to address. "The typical SLAPP suit involves citizens opposed to a particular real estate development. The group opposed to the project, usually a local neighborhood, protests by distributing flyers, writing letters to local newspapers, and speaking at planning commission or city council meetings. The developer responds by filing a SLAPP suit against the citizen group alleging defamation or various business torts. (Barker, *Common-Law and Statutory Solutions to the Problem of SLAPPS* (1993) 26 Loyola L.A. L.Rev. 395, 396.) SLAPP plaintiffs do not intend to win their suits; rather, they are filed solely for delay and distraction (*id.* at p. 397), and to punish activists by imposing litigation costs on them for exercising their constitutional right to speak and petition the government for redress of grievances. (See Comment, SLAPP Suits: *Weaknesses in First Amendment Law and in the Court's Responses to Frivolous Litigation* (1992) 39 UCLA L.Rev. 979.)" (*Dixon v. Superior Court* (1994) 30 Cal.App.4th 733, 741, italics & fn. omitted.)

On appeal, plaintiffs have abandoned their argument that defendants' speech and petitioning activity did not relate to an issue of public interest. Instead, they now contend

that defendants did not carry their burden because (1) plaintiffs' claims arise out of commercial speech, and (2) commercial speech does not constitute protected activity under the anti-SLAPP law. We separately address each prong of this argument.

**B. Plaintiffs' Claims Do Not Arise out of Commercial Speech**

This entire appeal is premised on plaintiffs' assumption that the allegedly unlawful speech attributed to defendants constitutes commercial speech. Remarkably, plaintiffs never define what they mean by commercial speech.

In another context, our Supreme Court has observed that three elements distinguish commercial speech from noncommercial speech: the speaker, the intended audience, and the content of the message. (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 960 (*Kasky*).) "In typical commercial speech cases, the speaker is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—or someone acting on behalf of a person so engaged, and the intended audience is likely to be actual or potential buyers or customers of the speaker's goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers . . . . [¶] . . . [¶] Finally, the factual content of the message should be commercial in character. In the context of regulation of false or misleading advertising, this typically means that the speech consists of representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services." (*Id.* at pp. 960–961, italics omitted.)

Applying the *Kasky* elements here, we conclude that the speech alleged in the complaint is not commercial speech. Plaintiffs did not allege facts to show that: any defendant was engaged in or affiliated with someone engaged in the production distribution or sale of goods or services, the challenged speech was directed at actual or potential buyers or customers of some good or service, or that the content of defendants' speech was commercial in character. To the contrary, the complaint seeks redress for speech and petitioning activity by individuals who formed a community group in order to

9

oppose an amendment to the City's general plan. On its face, this type of speech is political rather than commercial in nature.

Plaintiffs do not cite a single case supporting their characterization of defendants' alleged statements as commercial speech. Instead, they postulate that (1) defendants acted like competitors by proposing that the golf course be used for some purpose other than a housing development, and (2) once defendants "decided to compete" with DeNova, their "disparaging remarks . . . took on the character of commercial speech." We are not persuaded by this reasoning. The fact that defendants opposed an official government action (i.e., approval of the general plan amendment) by proposing that someone other than DeNova purchase the golf course did not make them competitors or transform their political action into commercial speech.

**C. All Commercial Speech Is Not Excluded from Anti-SLAPP Protection**

Even if there was some commercial element to defendants' conduct, plaintiffs fail to support their legal theory that commercial speech is categorically excluded from the protection of the anti-SLAPP law.

Plaintiffs acknowledge that protected activity is defined in section 425.16, subdivision (e), but then they proceed to ignore the language of that statute, which makes no reference to commercial speech. As discussed above, the pleading allegations about defendants' speech and petitioning activity fall squarely within all four categories of section 425.16, subdivision (e) because the challenged statements were made during or in connection with an official City proceeding authorized by law, in public forums, and in connection with a matter that was both a public issue and an issue of public interest.

Insisting that "[m]ultiple cases have recognized that commercial speech is outside the protections of the anti-SLAPP law," plaintiffs cite four cases, the facts of which they do not discuss: *Nagel v. Twin Laboratories, Inc*. (2003) 109 Cal.App.4th 39 (*Nagel*); *Jewett v. Capital One Bank* (2003) 113 Cal.App.4th 805 (*Jewett*); *Rezec v. Sony Pictures Entertainment, Inc.* (2004) 116 Cal.App.4th 135 (*Rezec*); *L.A. Taxi Cooperative, Inc. v. The Independent Taxi Owners Assn. of Los Angeles* (2015) 239 Cal.App.4th 918 (*L.A. Taxi*).

10

This line of authority does not support the broad rule of exclusion proposed by plaintiffs here.  For one thing, all of these cases involved a very specific form of commercial speech—false or misleading advertising.  (*Nagel*, *supra*, 109 Cal.App.4th 39 [class action against manufacturer and seller of diet pills]; *Rezec*, *supra*, 116 Cal.App.4th 135 [unfair business practices claims against movie studio]; *Jewett*, *supra*, 113 Cal.App.4th 805 [consumer class action against credit card company]; *L.A. Taxi*, *supra*, 239 Cal.App.4th 918 [taxi companies' suit against competing cab companies for false internet advertising].)  Equally important, in these cases the defendants failed to carry their burden under section 425.16, subdivision (e) because the plaintiffs' false advertising claims arose from purely commercial speech that was *not* made in connection with an official proceeding, and that did *not* relate to an issue of public interest.  (*Nagel*, at pp. 46–48; *Rezec*, at pp. 140, 143; *Jewett*, at pp. 814–816; *L.A. Taxi*, at p. 926.)  Thus, plaintiffs' cited authority is consistent with our conclusion that a plaintiff cannot preclude a defendant from establishing that a cause of action arises out of protected activity simply by alleging there is some commercial element to the parties' dispute.  Rather, the question whether a defendant has met its burden under section 425.16, subdivision (b) is answered by applying section 425.16, subdivision (e).

Plaintiffs' theory that all commercial speech is excluded from anti-SLAPP protection is also inconsistent with section 425.17, subdivision (c).  As discussed in our overview of anti-SLAPP law, this narrow commercial speech exemption applies to speech or conduct by a person engaged in the business of selling or leasing goods or services when, among other things, that challenged conduct pertains to the business of the speaker or his or her competitor.  (§ 425.17, subd. (c); see generally *Simpson*, *supra*, 49 Cal.4th at p. 21.)

Section 425.17's legislative history indicates that this statutory exemption was drafted "to track constitutional principles governing regulation of commercial speech based upon guidelines discussed in [*Kasky*, *supra*, 27 Cal.4th 939]."  (*JAMS, Inc. v. Superior Court* (2016) 1 Cal.App.5th 984, 994 (*JAMS*).)  "In doing so, it followed

'*Kasky*'s guidelines on commercial speech, focusing on the speaker, the content of the message, and the intended audience.' [Citation.]" (*Ibid.*)[5]

Plaintiffs relied on section 425.17, subdivision (c) during the lower court proceedings, but the trial court found that they failed to carry their burden of proof, or to even allege facts which could show that any defendant is "primarily engaged in the business of selling or leasing goods or services." (§ 425.17, subd. (c).) Indeed, the speech attributed to defendants in the complaint is not exempt from anti-SLAPP protections under section 425.17, subdivision (c) for essentially the same reasons that it does not constitute commercial speech under the *Kasky* guidelines.

Implicitly conceding that section 425.17, subdivision (c) does not apply in this case, plaintiffs now argue that "commercial speech not otherwise covered by section 425.17 may still be excluded from anti-SLAPP protection." They reason that (1) the Constitution treats commercial speech differently than noncommercial speech, and therefore (2) the anti-SLAPP law should also be construed to treat commercial speech differently by categorically excluding it from the protections afforded by section 425.16. This reasoning is flawed for at least two reasons. First, while "commercial speech receives a lesser degree of constitutional protection than many other forms of expression," (*Kasky*, *supra*, 27 Cal.4th at p. 946), commercial speech is not completely excluded from the realm of First Amendment protection, as plaintiffs intimate. (*Id.* at pp. 952–953.)

Second, as our Supreme Court explained in *Montebello*, "[t]he Legislature did not limit the scope of the anti-SLAPP statute to activity protected by the constitutional rights of speech and petition. It went on to include 'any act . . . *in furtherance of*' those rights. (§ 425.16, subd. (b)(1), italics added.) We must give meaning to this statutory term, under settled principles of statutory construction. [Citation.] The Legislature's directive

---

[5] " 'The legislative history [also] indicates this legislation is aimed squarely at false advertising claims and is designed to permit them to proceed without having to undergo scrutiny under the anti-SLAPP statute . . . .' [Citation.]" (*JAMS*, *supra*, 1 Cal.App.5th at p. 994.)

12

that the anti-SLAPP statute is to be 'construed broadly' so as to 'encourage continued participation in matters of public significance" supports the view that statutory protection of acts 'in furtherance' of the constitutional rights incorporated by section 425.16 may extend beyond the contours of the constitutional rights themselves. [Citations.]" (*Montebello*, *supra*, 1 Cal.5th at p. 421.)

In their reply brief, plaintiffs argue that *Montebello* is irrelevant because it "begs the question: what speech and petition activities does section 425.16 actually protect?" We disagree. *Montebello* precludes plaintiffs from using substantive First Amendment principles to limit the scope of protection afforded by the anti-SLAPP law: "Requiring the moving party to make a constitutional case in support of every anti-SLAPP motion would be inconsistent with the Legislature's desire to establish an efficient screening mechanism for 'disposing of SLAPP's quickly and at minimal expense to taxpayers and litigants.' [Citation.] The statutory categories provided in section 425.16, subdivision (e) provide objective guidelines that lend themselves to adjudication on pretrial motion. [Citation.]" (*Montebello*, *supra*, 1 Cal.5th at p. 422.)

"[C]ourts determining whether conduct is protected under the anti-SLAPP statute look not to First Amendment law, but to the statutory definitions in section 425.16, subdivision (e). [Citations.]" (*Montebello*, *supra*, 1 Cal.5th at pp. 422.) " 'The only means specified in section 425.16 by which a moving defendant can satisfy the requirement is to demonstrate that the defendant's conduct . . . falls within one of the four categories described in subdivision (e), defining subdivision (b)'s phrase, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue. [Citations.]" ' " (*Ibid*.) As we have already explained, the conduct alleged in this case falls squarely within all four of these categories. Plaintiffs cannot avoid this fact by attempting to graft an additional restriction onto the anti-SLAPP law limiting the protection of that law to strict adherence to First Amendment analysis.

13

### D. Plaintiffs Did Not Establish a Probability of Success

Under the second prong of our review, "the burden shifts to the plaintiff[s] to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff[s'] showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396.) "In making this assessment, the court must consider both the legal sufficiency of and evidentiary support for the pleaded claims, and must also examine whether there are any constitutional or nonconstitutional defenses to the pleaded claims and, if so, whether there is evidence to negate any such defenses. [Citation.]" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 108.)

On appeal, plaintiffs contend they carried their burden of establishing that their causes of action are not barred by either of the two defenses invoked by defendants in the trial court.

First, plaintiffs argue that defendants are not protected by the litigation privilege, which states that, subject to exceptions, a "privileged publication" includes statements made in a "legislative proceeding," a "judicial proceeding," "any other official proceeding authorized by law," or "in the initiation or course of any other proceeding authorized by law and reviewable pursuant to" pertinent provisions of the Code of Civil Procedure. (Civ. Code, § 47, subd. (b).)

"The litigation privilege is absolute; it applies, if at all, regardless whether the communication was made with malice or the intent to harm. [Citation.] Put another way, application of the privilege does not depend on the publisher's 'motives, morals, ethics or intent.' [Citation.] Although originally applied only to defamation actions, the privilege has been extended to any communication, not just a publication, having 'some relation' to a judicial proceeding, and to all torts other than malicious prosecution. [Citations.] Moreover, '[t]he litigation privilege is not limited to the courtroom, but encompasses actions by administrative bodies and quasi-judicial proceedings. [Citation.] The privilege extends beyond statements made in the proceedings, and includes statements

14

made to initiate official action.  [Citation.]' " (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 913, italics omitted.)

Plaintiffs contend that defendants are not protected by this broad litigation privileged because "commercial speech cannot be privileged speech as it is not subject to an anti-SLAPP motion."  We reject this argument because, among other things, it incorporates plaintiffs' erroneous factual theory that defendants engaged in commercial speech; it incorporates plaintiffs' unconvincing legal theory that all commercial speech is automatically excluded from the anti-SLAPP protection; and it is legally unsupported.

Alternatively, plaintiffs argue that defendants cannot invoke the litigation privilege because the complaint does not seek to hold defendants liable for their speech, but rather for an unlawful course of conduct evidenced by that speech.  The record shows otherwise.  Every claim in the complaint seeks to punish and/or suppress speech that relates to an official proceeding about a public issue.

Plaintiffs' second argument is that the *Noerr-Pennington* doctrine does not bar their claims against these defendants.  "Under the *Noerr-Pennington* doctrine, '[t]hose who petition government . . . are generally immune from antitrust liability.' [Citations.] 'This doctrine relies on the constitutional right to petition for redress of grievances to establish that there is no antitrust liability for petitioning any branch of government, even if the motive is anticompetitive.' [Citation.]  The doctrine further relies on principles of comity, 'i.e., noninterference on the part of the courts with governmental bodies that may validly cause otherwise anticompetitive effects and with efforts intended to influence such bodies.' [Citation.]" (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 964, fns. omitted (*Pacific Lumber*).)

"The *Noerr-Pennington* doctrine has been extended to preclude virtually all civil liability for a defendant's petitioning activities before not just courts, but also before administrative and other governmental agencies. [Citations.]" (*Pacific Lumber*, *supra*, 158 Cal.App.4th at pp. 964–965.)  "While the *Noerr-Pennington* doctrine was formulated in the context of antitrust cases, it has been applied or discussed in cases involving other types of civil liability [citations], including liability for interference with contractual

15

relations or prospective economic advantage [citations] or unfair competition [citation]. Obviously, the 'principle of constitutional law that bars litigation arising from injuries received as a consequence of First Amendment petitioning activity [should be applied], regardless of the underlying cause of action asserted by the plaintiffs.' [Citation.] '[T]o hold otherwise would effectively chill the defendants' First Amendment rights.' [Citation.]" (*Hi-Top Steel Corp. v. Lehrer* (1994) 24 Cal.App.4th 570, 577–578 (*Hi-Top Steel*).)

" 'It is only when efforts to influence government action are a "sham" that they fall outside the protection of the *Noerr-Pennington* doctrine . . . . [Citations.] Such efforts amount to a sham when though "ostensibly directed toward influencing governmental action, . . . [they are] actually nothing more than an attempt to interfere directly with the business relationships of a competitor . . . ." [Citation.] Such efforts, by contrast, do not amount to a sham when, no matter how anticompetitive in purpose or effect, they constitute a "genuine effort to influence [government action] . . . ." [Citation.] In other words, efforts to influence government action are a sham only when the person or persons making such efforts "invok[es] the process of [governmental] decisionmaking for the injury that the process alone will work on competitors . . . ." [Citations.]' " (*Pacific Lumber*, *supra*, 158 Cal.App.4th at p. 965.)

Plaintiffs contend that the "sham" exception to the *Noerr-Pennington* doctrine applies to their claims because they have alleged facts to show that defendants' petitioning activity was part of a misleading campaign, pursuant to which they "deliberately" chose a deceptive name for their group, mischaracterized the "current status" of the golf course property and the plaintiffs' development plan, and falsely accused plaintiffs' of misconduct. First, plaintiffs fail to demonstrate that these complaint allegations are supported by evidence. Second, even if there is evidence of these alleged deceptions, plaintiffs fail to explain how they implicate the sham exception. Indeed, it appears from this record that plaintiffs conceded from the start that defendants genuinely opposed the general plan amendment. Thus, defendants' petitioning activity,

16

no matter how deceptive, was not a sham, but part of a genuine effort to influence government action.  (*Pacific Lumber*, *supra*, 158 Cal.App.4th at p. 965.)

Plaintiffs direct us to *Hi-Top Steel*, *supra*, 24 Cal.App.4th 570, an unfair competition case filed by steel corporations against an automobile wrecking company and its owner.  The *Hi-Top Steel* court found that the plaintiffs stated a cause of action under the sham exception to the *Noerr-Pennington* doctrine by alleging the following material facts:  The defendants attempted to prevent the plaintiffs from competing in the automobile wrecking business by making false statements to public officials and interested citizens about the design of automobile shredding equipment the plaintiffs intended to install at their facility.  The city unanimously approved the plaintiffs' plan, but the defendants appealed, and then offered to withdraw their appeal if the plaintiffs agreed not to use their equipment to shred automobiles.  The defendants also threatened to cause further delay by demanding an environmental review of the plaintiffs' design plans, knowing that such a demand was groundless.  Then, during the period of delay that they caused, the defendants procured their own automobile shredding equipment.  (*Id*. at pp. 573–574.)  The *Hi-Top Steel* court found these allegations were sufficient to show that the "defendants undertook petitioning activity solely to delay or prevent plaintiffs' entry into the shredded automobile body market through use of 'the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon' [citation.]"  (*Id*. at p. 582–583, italics omitted.)

*Hi-Top Steel* is inapposite.  Suffice to say, the issue in this case is not only whether plaintiffs' complaint states a cause of action under the sham exception to the *Noerr-Pennington* doctrine (it does not), but also whether plaintiffs carried their burden of showing that their claims were "factually substantiated."  (*Baral v. Schnitt*, *supra*, 1 Cal.5th at p. 396.)  Plaintiffs do not identify any evidence in this record supportive of their theory that defendants undertook their petitioning activity as an anti-competitive weapon.

## V.  DISPOSITION

The judgment is affirmed.  Defendants are awarded costs on appeal.

_____
RUVOLO, P. J.

We concur:


_____
REARDON, J.


_____
STREETER, J.

A149735, *Dean v. Friends of Pine Meadows*

18

CALIFORNIA COURT OF APPEAL
FIRST APPELLATE DISTRICT
DIVISION 4

CHRISTINE DEAN et al.,
Plaintiffs and Appellants,
v.
FRIENDS OF PINE MEADOW et al.,
Defendants and Respondents.

A149735
Contra Costa County No. MSC16-00601

BY THE COURT:

The written opinion which was filed on February 8, 2018 has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and it is ordered published in the official reports.

Date: _____          _____ P. J.

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Hon. Judith Craddick |
| Counsel for Appellant Christine Dean: | Jenny & Jenny, Scott E. Jenny, Richard K. Jenny |
| Counsel for Appellants DeNova Homes, Inc. and Civic Martinez, LLC: | Miller Starr Regalia, George B. Speir, Matthew C. Henderson |
| Counsel for Respondents: | Strumwasser & Woocher, Fredric D. Woocher, Michael J. Strumwasser |
| | Stuart M. Flashman |